IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THOMAS HAUSCHILD,

    Plaintiff,

  v.

CITY OF RICHMOND and CHRISTOPHER MAGNUS, and DOES 1 through 10, inclusive,

    Defendants.

No. C 15-01556 WHA

**ORDER DENYING MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT ORDER**

## INTRODUCTION

In this wrongful termination action, plaintiff moves on the eve of trial for reconsideration of a much earlier order granting partial summary judgment for defendants. For the reasons stated below, the motion is **DENIED**.

## STATEMENT

Plaintiff Thomas Hauschild lost his job as a police officer for battering his estranged wife, a fellow officer; hanging a condom on the front door of her residence; possessing eight unregistered firearms; and lying about it all. His first amended complaint (the operative complaint), however, posed a different theory, namely that defendants City of Richmond and Police Chief Christopher Magnus "retaliated" against him for making complaints of public concern.

To go back to Square One, Hauschild filed his operative complaint in May 2015, alleging six separate claims related to the termination of his employment: (1) violation of the First, Fifth,

1   and Fourteenth Amendments under Section 1983; (2) discrimination in violation of California's
2   Fair Employment and Housing Act; (3) retaliation in violation of FEHA; (4) harassment in
3   violation of FEHA; (5) violation of the California Constitution; and (6) violation of the Public
4   Safety Officers Procedural Bill of Rights.  Plaintiff later dropped claim four (harassment) and
5   claim five (violation of the California Constitution).

6        The remaining claims, except for claim six (violation of the POBR), were dismissed
7   on summary judgment in June 2016 (Dkt. No. 78).  Now, on the eve of trial in February 2017,
8   Hauschild moves for reconsideration of the summary judgment order with regard to the First
9   Amendment retaliation claim under Section 1983.  Hauschild argues the June 2016 summary
10  judgment order gave short shrift to his theory that his alleged refusal to lie in connection with
11  someone else's racial discrimination complaint led to retaliation and thus violated the First
12  Amendment.  In support, he submits portions of his operative complaint, interrogatory responses,
13  and deposition testimony.

14       Although at least two other retaliation theories were presented on summary judgment,
15  the only theory which is now in dispute is Hauschild's alleged refusal to lie when Magnus
16  supposedly demanded Hauschild make a false statement during a racial discrimination
17  investigation involving some other officer (Dkt. No. 65 at 5–6).

18       In their reply on the earlier summary judgment motion, defendants argued that this theory
19  had no anchor in Hauschild's operative complaint or even in interrogatory answers (Dkt. No. 74
20  at 3–5).  Hauschild's operative complaint made no reference to any race discrimination case
21  (Dkt. No. 8 at 9):

> Defendants violated Plaintiff's First Amendment rights, in that
> Defendants retaliated against Plaintiff for making complaints of
> public concern to Defendants, and terminated Plaintiff as a result
> of his complaints of sexual harassment.

The operative complaint elaborated as follows but again made no reference to any race discrimination proceeding (*id.* at 5–6):

> After Plaintiff made complaints about Defendant Magnus's sexual
> advances, Defendants subjected Plaintiff to repeated adverse
> actions in the workplace, including but not limited to (1) denying
> overtime for Plaintiff, (2) denying training for Plaintiff,
> (3) removing Plaintiff from his position on the SWAT team,

2

> (4) refusing to allow Plaintiff to serve as Acting Sergeant, (5) refusing to select Plaintiff for a homicide position, even though Plaintiff had superior qualifications, (6) unilaterally audited Plaintiff's pay records, and demanding that he return part of his pay, (7) *Defendant Magnus demanded that Plaintiff lie about an incident involving the senior leadership of the department, and, when Plaintiff refused to lie, Defendants attempted to transfer Plaintiff out of the Cease Fire program*, and (8) subjecting Plaintiff to internal affairs investigations.

The italicized item, it is now said by plaintiff, purportedly notified defendants that his retaliation theory involved by his refusal to lie during a racial discrimination complaint.

In response to an interrogatory demanding all facts supporting a finding of malice as to Magnus' actions, Hauschild included the same wording italicized above — along with the entire factual background in his complaint (but for three short paragraphs) (Dkt. No. 62-6 at 105–109; Dkt. No. 8 at 3–8).  Again, race discrimination went unsaid.

The reader may wonder why it would matter if the refusal to lie involved a race discrimination case, as opposed to some other type of case.  This will eventually be addressed herein.  For now, it is enough to note both sides have heatedly contested the point.

To continue, testimony from Hauschild's deposition allegedly put defendants on notice of his refusal-to-lie theory.  This order pauses to note Hauschild added three pages of his deposition testimony to the instant motion that were *not* in the record on summary judgment, namely pages 92, 128, and 129 (*see* Dkt. No. 125-3 at 4–5, 9).[*]

The first time it came up in Hauschild's deposition, he testified about Magnus' attempts to transfer Hauschild out of the special investigations unit, which contained the Cease Fire program (Dkt. No. 125-3 at 6–7):

> Q: But you told me you were removed?
>
> A: What happened was, one, they made Arnold first, so they moved Lieutenant Threets out.  Then they were forcing me out — in September 2012, Magnus said, "You're going to leave, one way or the other." So he ended up giving me a transfer notice in December of 2012, I was being transferred out of investigations as of January 2013.

---

[*] In the supplemental briefing to the instant motion, Hauschild argues these extra pages were permissible because defendants brought a new argument in their earlier reply.  Defendants' new argument, according to Hauschild, was that Hauschild adopted new theories of retaliation for the first time in *Hauschild's* opposition.

3

> \* \* \*
>
> Q: You say one of — another one of your other complaints is, you were removed from the Cease Fire program. What was that all about?
>
> A: That was the same thing. In 2011, I actually was not — never removed. He tried to remove me, and then there was community backlash.

The next line of questioning related to Magnus' role in Hauschild receiving inferior work assignments in Cease Fire (Dkt. No. 125-3 at 8–9):

> Q: So what's your basis that Chief Magnus had — had some input into the way you were treated in the Cease Fire — on the Cease Fire team?
>
> A: I'll give you an example.
>
> So when we — when everything happened, there was a lot of things that occurred in Cease Fire. It all came from Anthony Williams. I was initially assigned to Anthony Williams, the captain. We would have meetings with Chief Magnus, and there were times when Chief Magnus would — would basically sit there and say, "Well, why did you think you could do that? Why did you do that?" And a lot of that came around because he wanted me to blame Lieutenant Threets for Cease Fire's failure.
>
> And I told him I couldn't say that because Lieutenant Threets never had any disparaging comments, at least not to me directly, about the [C]hief or Cease Fire. He'd always been supportive.

The last time this topic came up, defendants attempted to clarify what the Chief allegedly said when he demanded Hauschild lie (Dkt. No. 125-3 at 4):

> A: Again, he tried to get me to say that DeVone Boggan and Arnold Threets tried to set up Cease Fire to fail, that they were negatively impacting it. There was — there's a — there's a bunch of incidents in Cease Fire where the [C]hief kind of — and I disagree on things.
>
> Q: So what did the [C]hief say to you that led you to believe he wanted you to lie?
>
> A: Basically, he told me that he wanted me to say that DeVone Boggan and Arnold Threets set up Cease Fire to fail.
>
> Q: Is there any documentation of that conversation or that —
>
> A: We were in a meeting and I can tell you, I very specifically remember it, because I said, "Chief, I'm here to do a job.

4

> You're the [C]hief. Whatever you want, I'm going to do, as long as it's moral, legal, and ethical. And I'm not going to lie, and if you want someone that's going to come in here and lie and do what you want without having any standard or moral compass, then you can transfer me out." And I got the transfer memo the next day.
>
> That's how I remember that very specific conversation.
>
> And I want to say AB or even his former secretary might have been in there at the time.
>
> Q: Who was in the meeting?
>
> A: I believe his former secretary. I don't know if she was paying attention, but she was in there. I believe [Allwyn] Brown was in there also.

So, race discrimination per se never came up in these passages. The first time there was any express mention of a "racial discrimination" complaint was in Hauschild's opposition to defendants' summary judgment motion. Hauschild relied exclusively on his own declaration to make this point (Dkt. No. 67 at 4) (emphasis added):

> In 2011, Defendant Magnus demanded that I lie in connection with an investigation into a *racial discrimination* complaint against Defendant Magnus. While I was assigned to CeaseFire, a community policing program, Defendant Magnus demanded that I lie about several failures of the CeaseFire program to discredit an African-American command staff officer who had made a *racial discrimination* complaint against Defendant Magnus. I explained to Chief Magnus that I would not lie, as what he was asking me to do was immoral, illegal, and unethical. When I refused, Defendant Magnus looked at me with an extremely menacing face, saying "You're going to leave, one way or another." I interpreted this comment to mean that I now had a clear target on my back, and that Magnus would be looking for any pretext to terminate my employment.

The order in question found that Hauschild's new theory had not been reflected in Hauschild's operative complaint. Ultimately, however, the First Amendment retaliation claim lost because Hauschild's self-serving and uncorroborated evidence was too thin for a reasonable jury to find in his favor, particularly in light of defendants' substantial showing that they terminated Hauschild for legitimate reasons and long after the alleged refusal to lie. The order on the First Amendment retaliation claim was as follows (Dkt. No. 78 at 11–12; 11 n.3 omitted):

> As an initial matter, it should be noted that plaintiff asserts entirely new theories to support his First Amendment retaliation claim in his opposition to defendants' motion for summary judgment.

5

Plaintiff asserts that his First Amendment claim is supported by complaints he made "about the criminal misconduct of his former spouse" and his "refusal to lie during the course of a racial discrimination complaint" (Opp. at 24).

Plaintiff's new theory of retaliation is not reflected in the First Amended Complaint. A plaintiff may not raise new theories for the first time on summary judgment. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006). As such, the complaint did not put defendants on notice about the evidence they would need to defend against plaintiff's new allegations. This order finds that plaintiff failed to provide defendants with adequate notice of these allegations. Plaintiff's new theories will be disregarded.

What remains under the First Amendment retaliation claim is plaintiff's assertion that he was fired in retaliation for making complaints about alleged sexual harassment by Chief Magnus and for refusing to lie in the course of an investigation.

A First Amendment retaliation claim involves a five-step analysis: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Plaintiff's evidence of protected speech is thin. In a declaration, he avers that he made a complaint to his supervisor, Threets, about an alleged sexual advance by Magnus. The supervisor remembers no such thing. Plaintiff further avers that Magnus demanded he lie in connection with an investigation and that plaintiff refused to do so. These statements are uncorroborated by any other evidence.

Nonetheless, assuming arguendo that plaintiff complained to Threets, and that he refused to lie during an investigation, the City would have taken the same employment action regardless — and reasonably so.

For the reasons described above [in the FEHA retaliation analysis], defendants make a substantial showing that the City had a legitimate basis for the employment decision. A reasonable trier of fact could not conclude that plaintiff was terminated in retaliation for a complaint he made about an alleged sexual advance or for his alleged refusal to lie.

## ANALYSIS

Generally, a refusal-to-lie theory of retaliation is viable if the employer is a *private* firm. In *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 176 (1980), the Supreme Court of California held an employer's discharge of an employee is actionable in tort if it violates fundamental

6

principles of public policy. The *Tameny* decision held an employee validly pled a tort cause of action for wrongful termination based on his refusal to participate in an illegal scheme to fix retail gasoline prices. *Tameny* relied on *Petermann v. International Brotherhood of Teamsters*, 174 Cal.App.2d 184 (1959). There, the employer was held liable in tort for discharging an employee who refused instructions to perjure himself before a legislative committee.

*Tameny* claims, however, may *not* be brought against public entities, like our defendant. *Miklosy v. Regents of the University of California*, 44 Cal.4th 876, 899-902 (2008). In *Miklosy*, two scientists at the Lawrence Livermore National Laboratory claimed they were terminated for identifying costly and dangerous problems with the project they were working on. The decision rejected their *Tameny* claims in holding the Government Claims Act of 1963 abolished common law tort liability, including *Tameny* liability, for public entities. *Id.* at 900; Cal. Gov't. Code § 815.

So, *Miklosy* foreclosed any *Tameny* avenue for Hauschild. Both parties agreed on this at our recent oral argument.

This circumstance forced our plaintiff to resort to a different theory of relief, namely retaliation for exercising free speech rights, under Section 1983. It is well settled that public employers may not condition employment on the forfeiture of constitutional rights; however, public employers are also entitled to restrict their employees' speech in a manner similar to private employers. The Supreme Court summarized this balancing inquiry in *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006), stating "[w]hile the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance."

A First Amendment retaliation claim requires a five-factor analysis: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the

7

state would have taken the adverse employment action even absent the protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

*Significantly, Hauschild must prevail on all five factors to succeed; defendants need only disprove one*. *Coomes v. Edmonds School Dist. No. 15*, 816 F.3d 1255, 1260 (9th Cir. 2016). Hauschild bears the burden of showing the first three factors go in his favor. If Hauschild does so, the burden of proof is passed to defendants who must prevail either on the fourth or the fifth factor. The burden of persuasion remains at all times with Hauschild. *Eng*, 552 F.3d at 1070–72.

This order assumes without deciding that the first and second requirements would be met if a supervisor required a police officer to lie in testimony about a police program and the officer refused to do so. This would be true whether the proposed testimony involved a racial discrimination complaint or not. It is unnecessary to march through the many First Amendment decisions involved in this question because this order presupposes that they would support this theory. The problem is not the legal theory but the factual support.

### 1.  THE ALLEGED REFUSAL TO LIE WAS NOT A SIGNIFICANT FACTOR IN THE ADVERSE EMPLOYMENT ACTION.

Hauschild bears the burden under the third factor of showing defendants took an adverse employment action and that his refusal to lie was a substantial and motivating factor in the adverse action. *Id.* at 1071–72. Hauschild relies exclusively on his self-serving and uncorroborated declaration to show he refused to lie in the first place. Defendants invoke *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002), for the proposition that "uncorroborated and self-serving testimony" in itself does not always create a triable issue of material fact. The *Villiarimo* rule bears on both whether the refusal to lie was a significant factor in the adverse employment action and if the refusal to lie even occurred in the first place. Our court of appeals, however, has provided further guidance on this issue.

A district court may not disregard a declaration at the summary judgment stage solely because of its self-serving nature. "Declarations are oftentimes self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position." *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015). However, a self-serving

8

1  declaration does not always create a genuine issue of material fact for summary judgment.
2  The district court can disregard a self-serving declaration that states conclusions rather than facts
3  via admissible evidence. *Ibid.*

4  *Nigro* cited to *Villiarimo* and *F.T.C. v. Publishing Clearing House, Inc.*, 104 F.3d 1168,
5  1171 (9th Cir. 1997), as examples of appropriate instances to disregard self-serving declarations.
6  *Villiarimo* held that a declaration is properly disregarded if it includes facts beyond the
7  declarant's personal knowledge and without indicating how the declarant knows those facts
8  to be true. In *Publishing Clearing House*, the FTC demonstrated that the defendant had the
9  requisite control over PCH, a corporation, to be liable for its judgment against it. The FTC
10 provided evidence that the defendant obtained and signed PCH's business license and signed
11 the fund-raising agreement between PCH and a charity, and the charity's application to conduct
12 charitable solicitation identified the defendant as the person in direct charge of conducting the
13 solicitation. The defendant asserted that she took these actions only because her partner had
14 convinced her that he could not legally open a telemarketing business in his name due to pending
15 criminal charges. The decision disregarded her affidavit as insufficient to create a genuine issue
16 of material fact because it was a conclusory, self-serving affidavit, lacking detailed facts and any
17 supporting evidence. *Ibid.*

18 If ever there were a situation to apply this rule, it is here. Hauschild provided only his
19 uncorroborated and self-serving declaration as evidence that Magnus demanded he "lie" during
20 the course of a formal racial discrimination complaint. The declaration lacked specific facts to
21 support this claim. He could not identify the timing of the conversation except to say it was
22 sometime in 2011. He declared that the Chief wanted him to blame an African-American
23 command staff officer for "several failures" of the Cease Fire program. That Hauschild
24 allegedly refused to blame someone hardly means that he was being asked "to lie," for blame in
25 such circumstances is a matter of opinion. After Hauschild allegedly expressed a contrary
26 opinion, the Chief did not insist that Hauschild conform his testimony to the view expressed by
27 the Chief, at least insofar as the declaration revealed. There is nothing in the summary judgment
28 record showing that Hauschild ever even gave testimony in the race discrimination case — or

9

1 that he was ever even scheduled to do so. Furthermore, Hauschild's declaration is inconsistent
2 with his deposition. Hauschild asserted in his declaration that when he refused to lie during this
3 meeting sometime *in 2011*, Magnus menacingly said, "You're going to leave, one way or the
4 other" (Dkt. No. 67 at ¶10). His deposition, on the other hand, pinned that comment "*in
5 September of 2012*," when Magnus allegedly said, "You're going to leave, one way or the other"
6 (Dkt. No. 125-3 at 6). Finally, the declaration finished with the conclusory statement, "I
7 interpreted this comment to mean that I now had a clear target on my back, and that Magnus
8 would be looking for any pretext to terminate my employment." (Dkt. No. 67 at ¶10). This kind
9 of self-serving conclusion is exactly what *Villiarimo* condemned.

As for corroboration, none exists. This order notes that Hauschild said during his deposition that Magnus' former secretary and possibly another person were in the refusal-to-lie meeting (Dkt. No. 125-3 at 5). Hauschild, however, has submitted no statement, declaration, or testimony from either of those two potential witnesses to corroborate his story either on the original summary judgment motion or this motion for reconsideration. (Magnus, of course, denies it.)

With respect to the alleged directive to lie, there is no showing by anyone, including Hauschild, that he ever told anyone about it. Nor did he mention the alleged refusal to lie at any time when he was subjected to the internal affairs investigation in September 2012 — one of the alleged retaliatory actions resulting from his refusal to lie. The first time Hauschild ever made any allegation about any refusal to lie came when he filed this lawsuit in April 2015, at least forty months and possibly as many as fifty-two months after it supposedly occurred.

This failure of proof is dispositive.

### 2. DEFENDANTS WOULD HAVE TAKEN THE ADVERSE ACTION ABSENT PROTECTED SPEECH.

Also dispositive is that defendants have proven beyond reasonable dispute that they would have terminated Hauschild in any event.

The final factor in the *Eng* test "asks whether the adverse employment action was based on protected *and* unprotected activities, and if the state would have taken the adverse action if the proper reason alone had existed." *Eng*, 552 F.3d at 1072. Defendants had four proper

10

reasons. Hauschild was found guilty of battering his estranged wife, a fellow officer; hanging a condom on the front door of her residence; possessing eight unregistered firearms; and lying about it all. He does not categorically deny these allegations. Rather, Hauschild argues only that he was not the primary aggressor in the domestic violence incident; that he cannot recall hanging the condom on her door but admits he might have done so; that the search of his locker containing the guns was improper and that the officers he received the guns from should have been disciplined as well.

Defendants showed legitimate, non-discriminatory reasons for firing Hauschild. This too is dispositive.

## CONCLUSION

For the reasons stated above, plaintiff's motion for reconsideration is **DENIED**.

The Court suspects that this motion for reconsideration was really intended to lard the record with new angles and extra evidence that could have been used seven months ago when the original motion was decided. On appeal, counsel shall please be frank with our court of appeals as to what was and was not before the Court at the time of the original ruling.

**IT IS SO ORDERED.**

Dated: February 15, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE